In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-09-00045-CR


______________________________




JAMES SENTRELL CHISM, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 115th Judicial District Court


Upshur County, Texas


Trial Court No. 14,970




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Carter



O P I N I O N



 After unsuccessfully moving to suppress the physical evidence against him, James Sentrell
Chism pled guilty to possession of a controlled substance, less than one gram of cocaine, and was
sentenced to two years' confinement in a state jail facility. See Tex. Health & Safety Code Ann.
§ 481.115 (Vernon 2003). Chism contends the trial court erred by denying his motion to suppress.

 The hearing on the motion to suppress revealed that former Gilmer Police Officer James
Griswold responded to a report of a man panhandling (1) at a local convenience store. After finding
a man who met the description provided, talking to him, patting him down, asking questions, and
seeing a prescription pill bottle in his pants pocket despite his efforts to conceal it, Griswold
ultimately seized the pill bottle, which contained a small plastic bag containing white residue later
discovered to be cocaine. Chism challenges various stages of his interaction with Griswold and
maintains the trial court should have granted his motion to suppress the physical evidence obtained
during that interaction. We agree with Chism and outline the events in question in more detail
below.

I. STANDARD OF REVIEW

 We review a trial court's ruling on a motion to suppress under a bifurcated standard. See
Wiede v. State, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007). We review de novo the legal
determinations of detention, reasonable suspicion, and probable cause under the Fourth Amendment
while granting great deference to a trial court's factual findings. State v. Sheppard, 271 S.W.3d 281,
286-87 (Tex. Crim. App. 2008). The trial court's evidentiary ruling "will be upheld on appeal if it
is correct on any theory of law that finds support in the record." Gonzalez v. State, 195 S.W.3d 114,
126 (Tex. Crim. App. 2006).

 "Beginning with the officer's initial intrusion, we evaluate the reasonableness of each
incremental level of intrusion, based on the information possessed by the officer at that time." 
Citizen v. State, 39 S.W.3d 367, 370 (Tex. App.--Houston [1st Dist.] 2001, no pet.). Here, we will
examine the initial detention, the pat down, the viewing of the pill bottle, and the seizure of the pill
bottle.

II. THE INVESTIGATIVE DETENTION

 At about 9:30 a.m. on a Sunday morning, a call came in to the Gilmer Police Department for
service to the Top Stop convenience store concerning a black man panhandling. The store clerk
reporting the incident described the suspect as a black male wearing blue jeans, a white tank top, and
a black baseball cap and having left the scene on foot traveling north on Highway 271. (2) 

 Griswold went to the area to look for the individual. He shortly found Chism, walking along
Highway 271, and made contact with Chism at that time. Griswold stepped out of his vehicle and
"asked [Chism] to step over to [his] vehicle." Griswold testified that Chism "complied" with his
"instructions." Griswold advised Chism that he was investigating a report of panhandling. 

 In response to the State's questioning, Griswold testified that when he stopped to talk to
Chism, he had reasonable good faith to believe that the individual was the individual who had been
reported as panhandling. Griswold would later concede the city ordinance prohibiting panhandling
only applied to such activity between the hours of sunset and sunrise, a limitation of which Griswold
was unaware at the time of his encounter with Chism. Though Chism had not committed a technical
violation of the city ordinance prohibiting panhandling, Griswold maintained that he had a good-faith
reasonable belief that a crime had occurred. 

 A. When and for What Purpose May an Officer Perform an Investigatory
Detention


 When an officer has a reasonable suspicion based on articulable facts that criminal activity
is afoot and a certain person is connected with the activity, the officer may make an investigative
stop of that person even though grounds for arrest do not exist. Terry v. Ohio, 392 U.S. 1, 20-29
(1968); Sheppard, 271 S.W.3d at 287. The articulable facts "must create some reasonable suspicion
that some activity out of the ordinary is occurring or has occurred, some suggestion to connect the
detainee with the unusual activity, and some indication the unusual activity is related to crime." 
Garza v. State, 771 S.W.2d 549, 558 (Tex. Crim. App. 1989).

 These facts must amount to more than a mere inarticulable hunch or suspicion. Williams v.
State, 621 S.W.2d 609, 612 (Tex. Crim. App. 1981). "The behavior of the suspect need not suggest
the commission of a particular offense; any sufficiently suspicious criminal activity may justify a
stop." Hill v. State, 951 S.W.2d 244, 247 (Tex. App.--Houston [14th Dist.] 1997, no pet.); see
Jenkins v. State, No. 06-08-00158-CR, 2009 Tex. App. LEXIS 304, at *4-5 (Tex. App.--Texarkana
Jan. 16, 2009, no pet.) (mem. op., not designated for publication). Any investigative detention that
is not based on reasonable suspicion is unreasonable and violates the Fourth Amendment. Davis v.
State, 947 S.W.2d 240, 242 (Tex. Crim. App. 1997).

 B. Reviewing the Validity of an Investigative Detention

 The burden is on the State to elicit testimony showing sufficient facts to create a reasonable
suspicion. Garcia v. State, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001). Whether reasonable
suspicion exists is determined by considering the facts known to the officer at the moment of
detention. Davis, 947 S.W.2d at 243. A determination of reasonable suspicion must be based on
common-sense judgments and inferences about human behavior. See Illinois v. Wardlow, 528 U.S.
119, 125 (2000).

 Griswold testified he stopped Chism, who met the description provided, to investigate the
report of panhandling. That the city ordinance really only prohibited panhandling between the hours
of sunset and sunrise does not invalidate the investigative detention of Chism during daylight hours. 
His behavior, though perhaps not a technical violation of the city ordinance, was sufficiently
suspicious to justify an investigative detention. Assuming that the initial encounter between
Griswold and Chism was an investigatory detention implicating Fourth Amendment protections, (3)
we conclude the initial investigative detention was sufficiently justified by reasonable suspicion. 
That said, we move on to the next stage of the interaction, the pat down, with the understanding that
Griswold had lawfully detained Chism for investigative purposes.

III. THE PAT DOWN

 After Griswold detained Chism and directed him to step over to the police car, Chism offered
no resistance to the conversation and did not appear to be reluctant to speak with Griswold. There
had been no report to Griswold that Chism had acted in a threatening manner. Griswold then asked
Chism to identify himself and checked Chism for weapons for officer safety. Griswold had not seen
anything that made it appear that Chism might have a weapon and had not detected any movements
that would suggest Chism had or was about to use a weapon. Chism did not exhibit any behavior
that would suggest that he was about to flee or otherwise pose a threat to Griswold. 

 Griswold testified that it was his "normal practice" to always search for weapons: "Every
single time I make contact with a suspect[,] I check for weapons for officer safety." He offered the
following explanation as the objective reasonable basis for conducting his "normal practice" weapon
search: "I'm making a contact with a person that I don't know who people are accusing of an
offense." He confirmed that Chism made no threat to him at all. Griswold also confirmed that
Chism complied with his directions when he announced that he would be checking Chism for
weapons. 

 The record suggests that Chism told Griswold that he had awakened in someone's yard and
did not know how he had gotten there and was walking back toward the Lake O' the Pines. Griswold
explained that he believed Chism possessed narcotics (4) because of Chism's "disoriented state," the
fact that Chism had slept in a vehicle, and "just the factors of the situation." 

 When prompted by the State, Griswold testified the transient population in Gilmer usually
have weapons on them; Griswold has found knives, screwdrivers, and handguns. He also testified
that in his experience, a number of the transient population in Gilmer abuse narcotics and often have
needles and such on their persons. Though directly contradictory to his earlier testimony, Griswold
then testified he was worried Chism might stab him with one of these items. Griswold's pat down
of Chism, however, did not reveal any weapons. 

 A. When an Officer Can Perform a Pat Down

 The Fourth Amendment prohibits unreasonable searches and seizures. O'Hara v. State, 27
S.W.3d 548, 550 (Tex. Crim. App. 2000). Searches conducted without a warrant are unreasonable
per se under the Fourth Amendment, subject only to a few specifically established and
well-delineated exceptions. Id. One exception to the warrant requirement occurs when an officer
is justified in believing that an individual is armed and presently dangerous. Id. In that situation,
the officer may conduct a pat-down search to determine whether the person is carrying a weapon. 
Id. It would be unreasonable to deny a police officer the right to neutralize the threat of physical
harm. Id.

 Terry does not authorize a frisk for weapons in all confrontational encounters. Maryland v.
Buie, 494 U.S. 325, 333-34 (1990). A police officer who has lawfully detained a person for
investigation may conduct a protective search of the detainee's outer clothing for weapons if the
officer has a reasonable belief based on specific, articulable facts that the person is armed and
dangerous. See Terry, 392 U.S. at 27; Sheppard, 271 S.W.3d at 287; Sikes v. State, 981 S.W.2d 490,
492 (Tex. App.--Austin 1998, no pet.). While an officer need not be absolutely certain that the
person he or she pats down is armed and dangerous, the specific facts supporting the pat down must
amount to more than a mere hunch or suspicion. Terry, 392 U.S. at 27; Sikes, 981 S.W.2d at 492. 
An officer need only be able to "point to specific and articulable facts, which, taken together with
rational inferences from those facts, reasonably warrant [the] intrusion." Terry, 392 U.S. at 21;
O'Hara, 27 S.W.3d at 550-51. The United States Supreme Court has been "careful to maintain" the
"narrow scope" of the pat-down exception. Ybarra v. Illinois, 444 U.S. 85, 93 (1979); O'Hara, 27
S.W.3d at 551.

 As noted, the purpose of a limited search after an investigatory stop is not to discover
evidence of crime, but to allow the officer to pursue his or her investigation without fear of violence. 
See Wood, 515 S.W.2d at 306; see also Guevara v. State, 6 S.W.3d 759, 764 (Tex. App.--Houston
[1st Dist.] 1999, pet. ref'd) (pat down unreasonable despite reasonable suspicion that defendant
possessed cocaine because detention occurred in nonthreatening circumstances, no evidence existed
that defendant was armed, and defendant was cooperative).

 B. What Situations Will Not Justify a Pat Down

 Pat-down searches conducted solely as a matter of routine or procedure are not justified. See
In re A.T.H., 106 S.W.3d 338, 347 (Tex. App.--Austin 2003, no pet.); Sikes, 981 S.W.2d at 494. 
Constitutional protections against unreasonable searches cannot be whittled away by police
regulations or standard operating procedure. Salazar v. State, 893 S.W.2d 138, 143 (Tex.
App.--Houston [1st Dist.] 1995, pet. ref'd, untimely filed) (citing Benavides v. State, 600 S.W.2d
809, 812 (Tex. Crim. App. [Panel Op.] 1980)).

 To illustrate circumstances that do not justify a pat down, we first point to A.T.H., 106
S.W.3d at 347. The officer in A.T.H. testified he conducted a pat down only for routine safety
concerns. Id. The Austin court noted that such testimony does not automatically invalidate the pat
down and went on to perform the proper inquiry: did the record show a reasonably prudent officer
would believe that the officer or others might be at risk, thus justifying a pat down? Id.

 The record showed that the encounter occurred in a high school parking lot in broad daylight
during a school day. Id. The officer did not testify that A.T.H. appeared dangerous or made any
erratic, suspicious, furtive, or threatening gestures, acted reluctant to speak to the officer, "or was
anything other than cooperative when asked his name and birthday." Id. There was no evidence that
A.T.H. was dressed in such a way as to conceal a weapon. See id. (citing Russell v. State, 74 S.W.3d
887, 892 (Tex. App.--Waco 2002, pet. ref'd)). The court concluded the officer did not articulate and
the totality of the circumstances did not demonstrate facts to indicate he was justified in conducting
a pat down for weapons. Id.

 The court rejected the State's contention that the anonymous tip that indicated A.T.H. was
one of the teens smoking marihuana gave the officer reasonable suspicion to conduct the pat down;
the court pointed out that the tip related only to alleged drug use, whereas the officer testified he was
conducting a routine pat down for weapons. Id. The court emphasized the weapons pat-down
exception "is very narrowly drawn" and, even viewing the evidence in the light most favorable to
the ruling, went on to conclude that the record did not support a finding that a reasonably prudent
officer would believe that A.T.H. might be armed. Id. 

 The pat down in Sikes was similarly unjustified when officers stopped the vehicle in which 

Sikes was a passenger after the officer witnessed what he believed to be burglary of a vehicle. (5) 981
S.W.2d at 491. Sikes was apparently intoxicated and admitted he had been drinking and taking over-the-counter medicine. Id. The driver, Sikes' brother, eventually consented to a search of the vehicle. 
Id. Another officer arrived and supervised the two brothers as the first officer searched the vehicle. 
Id. The second, supervising officer testified he repeatedly told them to keep their hands out of their
pockets. Id. He then asked them to empty their pockets; both complied, revealing no weapons and
no contraband. Even after their pockets were emptied, he performed pat downs of both brothers, for
"officer safety." Id. He also testified, "Well, personally[,] I do a pat down search whenever we
search a vehicle to make sure that they might not pull out something while we're searching the
vehicle." Id.

 As he performed the pat down on Sikes, the officer was able to see into the pocket of Sikes'
baggy shorts and saw a plastic sandwich bag. Based on his training and experience and given Sikes'
apparent intoxication, the officer suspected that the bag contained marihuana and reached into the
pocket and seized the bag. Id. at 492. Sikes did not challenge the investigative detention. He
challenged only the justification for the pat down, contending that the pat down was an
unconstitutional search. Id. The Austin court agreed.

 The State cited the fact that both brothers kept putting their hands in their pockets and
pointed to Worthey v. State, 805 S.W.2d 435 (Tex. Crim. App. 1991), for support that such behavior
was sufficient to cause a reasonable concern for officer safety. The court rejected that contention,
distinguishing the facts in Worthey. Sikes, 981 S.W.2d at 493. In Worthey, the encounter occurred
at 3:00 a.m. when the appellant arrived at a house being searched pursuant to a warrant and was told
to keep her hands where they could be seen. 805 S.W.2d at 437. She immediately clutched her
purse and turned it away from the officer, who believed there might be a weapon in the purse, took
it, frisked it, and found methamphetamine. Id. The Sikes court emphasized that the time of day was
a noteworthy distinction, as were "other circumstances" present in Worthey. 981 S.W.2d at 493.

 The Austin court pointed out that the encounter in Sikes took place mid-afternoon and that
there was no evidence that Sikes had been "anything other than cooperative." Id. Although Sikes
appeared to be intoxicated, neither officer testified he believed Sikes might be a danger to himself
or others. Id. Neither officer testified they saw any furtive gestures or observed any suspicious
bulges that might be concealed weapons. Id. The court also emphasized that the officer performing
the pat down testified he performed this pat down as a matter of routine. Id. The court also
distinguished several other cases, concluding that in Sikes, there were no objective, articulable facts
in the record to support the officer's professed concern for his safety. Id. at 493-94. Even viewing
the evidence in the light most favorable to the court's ruling, the Sikes court concluded that the State
failed to prove that the pat-down search was constitutionally justified. Id. at 494. 

 In Guevara, the investigative detention was justified by an anonymous tip regarding a drug
transaction. 6 S.W.3d at 762. The "weapons" pat down, which yielded the small amount of cocaine
expected, however, was not justified. Id. at 764. The court pointed out that the detention occurred
in the middle of the day in a public parking area not designated as a high crime area. Id. There was
no information from the tipster that Guevara was to be considered armed and dangerous. Id. 
Guevara was cooperative and did nothing furtive or suspicious that might have indicated a threat to
the officer. Id. The court also pointed out that in light of the anonymous tip, the officer knew that
at best, the transaction would involve only a small amount of cocaine. Id. The officer "acquiesced"
to State questioning, explaining that he patted down Guevara for weapons and contraband, but never
specified why he believed the situation was unsafe. Id. It was obvious to the Guevara court that the
officer was searching for the cocaine mentioned in the tip; he testified that he was. Id. The court
rejected the State's argument that the violent nature of narcotics transactions made it reasonable to
suspect that the appellant might have a weapon: "These reasons are merely the 'unparticularized'
suspicions or 'hunches' which Terry held are not enough to justify a self-protective search." Id. 

 C. Review of the Validity of a Pat Down

 So, it is clear that police regulations or routines are not sufficient to justify a pat-down search. 
See O'Hara, 27 S.W.3d at 553; Sikes, 981 S.W.2d at 494. However, not every pat-down search
performed as a matter of routine will be overturned automatically. O'Hara, 27 S.W.3d at 554. Even
if an officer conducts a pat down simply as a matter of routine, the objective facts available to the
officer may still justify the pat down. Id. Whether a Fourth Amendment violation has occurred
"turns on an objective assessment of the officer's actions in light of the facts and circumstances
confronting him at the time, and not on the officer's actual state of mind at the time the challenged
action was taken." Maryland v. Macon, 472 U.S. 463, 470-71 (1985); Sheppard, 271 S.W.3d at 288;
O'Hara, 27 S.W.3d at 551; Davis, 947 S.W.2d at 242-43. In other words, an officer's testimony that
he or she was not afraid of the suspect does not automatically invalidate a pat-down search for
weapons. (6) O'Hara, 27 S.W.3d at 551.

 Instead, we must remain focused on the proper question by asking whether, under an
objective analysis, a reasonably cautious person would be justified in making a precautionary search
for weapons. See Terry, 392 U.S. at 27; O'Hara, 27 S.W.3d at 551. The officer need not be
absolutely certain that the individual is armed. Reasonable inferences that the officer is entitled to
draw by analyzing the facts in light of his or her experience may be all that is necessary to
characterize the officer's actions as reasonable. See Terry, 392 U.S. at 27.

 A defendant alleging a Fourth Amendment violation bears the burden of producing some
evidence to rebut the presumption of proper police conduct and "meets his initial burden of proof
by establishing that a search or seizure occurred without a warrant." Russell v. State, 717 S.W.2d
7, 9 (Tex. Crim. App. 1986). The burden then shifts to the State to prove that the search or seizure
was nonetheless reasonable under the totality of the circumstances. See id. at 9-10. In determining
whether the State carried its burden, we must give great deference to the trial court's determination
of the historical facts. See Estrada v. State, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005). We are
not at liberty to disturb any finding supported by the record. Arnold v. State, 873 S.W.2d 27, 34
(Tex. Crim. App. 1993).

 D. Analysis and Conclusion

 Here, Griswold legally detained Chism, who met the description of a man reported as having
engaged in suspicious behavior at the convenience store. However, the record indicates that Chism
posed no danger to Griswold. Chism was alone, and there is no indication that the location of the
detention was a high-crime area. Chism was suspected of panhandling, not generally considered a
violent offense that could lend itself to justifying concern for officer safety. Griswold confirmed that
Chism was nothing but compliant during the encounter. Further, the encounter took place mid-morning, in broad daylight. Griswold testified he saw no bulges that would suggest a concealed
weapon and that Chism made no furtive movement that would suggest Chism was about to flee or
that Chism posed a threat to Griswold. (7)
 Griswold testified plainly he had no concern that Chism was
carrying a weapon:

 [DEFENSE COUNSEL]: Did you see anything on his person that appeared
to you that he might have a weapon?

 

 [GRISWOLD]: No, sir. 

 

 . . . .

 

 [DEFENSE COUNSEL]: Did he make any threats or gestures to you that
you took as exhibiting some type of threat towards you?

 

 [GRISWOLD]: No, sir.

 

 . . . .

 

 [DEFENSE COUNSEL]: And he did nothing to threaten you in any
manner; is that correct?

 

 [GRISWOLD]: That's correct.

Instead, he explained, he performs a pat-down search as a matter of routine: "Every single time I
make contact with a suspect[,] I check for weapons for officer safety." "I'm making a contact with
a person that I don't know who people are accusing of an offense." 

 Recognizing that Griswold's testimony regarding his "normal practice" and his lack of
subjective fear are not conclusive on the issue, we look to the only evidence in the record touching
on a concern for officer safety. This testimony came in Griswold's response to the State's leading
questions on the matter:

 [STATE]: Okay. [Defense counsel] makes a big deal about you Terry
stopping him for no reason, you Terry stop everybody in the world. People that are
walking in Gilmer, transient population, do they usually have weapons on them?

 

 [GRISWOLD]: Yes.

 

 [STATE]: Okay. Such as?

 

 [GRISWOLD]: I have found knives, screwdrivers, handguns.

 

 [STATE]: A lot of transient population also abuse narcotics?

 

 [GRISWOLD]: Yes, sir.

 

 [STATE]: Would they also have needles, such things on them?

 

 [GRISWOLD]: That is correct.

 

 [STATE]: So were you worried that he might possibly stab you with one
of these items?

 

 [GRISWOLD]: Yes.

 

 [STATE]: Is it normal for you to have these apprehensions of someone
walking, panhandling that might hurt you?


 [GRISWOLD]: That's correct.

Much like the officer in Guevara, Griswold "acquiesced" to the State's prompting/questioning about
safety concerns. Moreover, Griswold based this concern for officer safety solely on Chism's status
as a transient, a status that although suggested, is not conclusively established by the record. 
Because Chism appeared to be homeless, Griswold assumed that he would be an armed and
dangerous narcotics abuser. And that was his justification for the newly-revealed concern for his
safety.

 Taking that evidence in the light most favorable to the trial court's ruling, even though it is
directly contrary to his earlier testimony, we conclude that such evidence still falls short of the
standards set forth in Terry. Terry requires that "due weight must be given, not to [the officer's]
inchoate and unparticularized suspicion or hunch, but to the specific reasonable inferences which
[the officer] is entitled to draw from the facts in light of his experience." 392 U.S. at 27. The officer
''must be able to point to particular facts from which he reasonably inferred that the individual was
armed and dangerous." Sibron v. New York, 392 U.S. 40, 64 (1968) (emphasis added).

 Here, we have only generalizations concerning weapons and narcotics abuse within the
transient population of Gilmer, Texas. Assuming the veracity of Griswold's professed concern, we
find that it runs afoul of Terry's prohibition of pat-down searches based on "unparticularized
suspicion[s] or hunch[es]." These broad and bold generalizations based on an individual's transient
status are insufficient to authorize a reasonable belief or inference that the person is armed and
dangerous. To conclude otherwise would subject very nearly any lawfully detained homeless or
transient person to a pat-down search at any moment. This is unreasonable. 

 Similar to the encounter in Sikes, we see a daylight detention of a compliant individual
suspected of a nonviolent offense, a pat down performed as a matter of routine, and a record devoid
of any specific facts to suggest the individual was a danger to the officer or to support the officer's
professed concern for safety. Like the officer in Guevara, Griswold did acquiesce to the State's 
leading questioning and testified that he was concerned for his safety. But that concern, based solely
on generalizations of a population, is insufficient to serve as justification for the pat-down search. 
In much the same way as did the Houston First Court in Guevara, we reject these "'unparticularized'
suspicions or 'hunches' which Terry held are not enough to justify a self-protective search." 6
S.W.3d at 764; see Ybarra, 444 U.S. at 93 (fact that defendant was wearing 3/4-length lumber jacket
which could be expected on almost any tavern patron in Illinois in early March does not articulate
any specific fact that would have justified a police officer at scene reasonably concluding defendant 
was armed and dangerous).

 Viewing the evidence in a light most favorable to the trial court's ruling, we find that the only
evidence that Griswold was concerned that Chism was armed and dangerous is Griswold's extracted,
internally inconsistent testimony concerning his generalized ideas of the transient population. This
evidence is contradictory to Griswold's original account that he did not have any concern about a
threat or a weapon when approaching Chism who was, by Griswold's own account, compliant during
the encounter. Even in a most favorable light, Griswold's later testimony recalling a concern for
safety is based on broad generalizations of the homeless population and, as such, falls short of a
reasonable belief based on specific, articulable facts that the person is armed and dangerous. See
Terry, 392 U.S. at 27; Sheppard, 271 S.W.3d at 287. Based on the totality of the circumstances and
the facts known to Griswold at the moment of the pat down, we find the facts do not support a 
reasonably prudent concern for officer safety and that the resultant weapons pat down was
unjustified; the motion to suppress the controlled substance found in the search should have been
granted. 

 We reverse the trial court's judgment and remand the cause to the trial court for further
proceedings.


 Jack Carter

 Justice


Date Submitted: July 24, 2009 

Date Decided: September 16, 2009


Publish 
1. "[P]anhandle" - "to accost passers-by on the street and and beg from them. . . . . so called
from the resemblance of the extended arm to a panhandle." Random House Webster's
Unabridged Dictionary 1402 (2nd ed. 2001)
.
2. Another officer would later go to the store to get a further description and information. But
at the time Griswold was dispatched, the extent of the information was as described. 
3. Not every encounter between police and citizens implicates the Fourth Amendment. Hunter
v. State, 955 S.W.2d 102, 104 (Tex. Crim. App. 1997). A mere request for an individual to stop or
submit to a search does not necessarily constitute a ''stop," and such a request need not be justified
by reasonable suspicion. See id. Only if the officer conveyed a message that compliance was
required has a consensual encounter become a detention. In determining whether the officer
conveyed  such  a  message  to  the  suspect,  we  consider  the  following  nonexhaustive  factors: 
(1) whether the officer was in uniform; (2) whether the officer exhibited a weapon; (3) the number
of officers present; (4) whether the officer suggested that he or she would get a warrant if the
defendant did not comply; (5) whether the officer told the defendant he or she believed the defendant
was carrying drugs; and (6) whether the officer told the defendant that compliance was or was not
required. Id. An investigative detention occurs when an individual is encountered by a police
officer, yields to the officer's display of authority, and is temporarily detained for purposes of an
investigation. Johnson v. State, 912 S.W.2d 227, 235 (Tex. Crim. App. 1995). A person "yields to
an officer's display of authority" when a reasonable person would not feel free to continue walking
or otherwise terminate the encounter. Florida v. Bostick, 501 U.S. 429, 436 (1991); State v.
Velasquez, 994 S.W.2d 676, 679 (Tex. Crim. App. 1999).
4. As we will explore later, we pause here to note that a weapons pat down is not intended to
allow an officer to search for evidence of a crime. See Wood v. State, 515 S.W.2d 300, 306 (Tex.
Crim. App. 1974).
5. It was later determined that neither brother had committed the offense of burglary of a
vehicle; Mark Sikes, appellant's brother and the driver, was merely putting a note in his girlfriend's
vehicle. See Sikes, 981 S.W.2d at 491.
6. As the Fifth Circuit Court of Appeals has observed, there is "no legal requirement that a
policeman must feel 'scared' by the threat of danger" because "some foolhardy policemen will never
admit fear." O'Hara, 27 S.W.3d at 551 (quoting United States v. Tharpe, 536 F.2d 1098, 1101 (5th
Cir. 1976), overruled in part on other grounds by United States v. Causey, 834 F.2d 1179 (5th Cir.
1987)).
7. There is no evidence that Chism exhibited any of the nonexclusive list of factors that the
Texas Court of Criminal Appeals has listed as authorizing a protective search: 


 1) no flight or no furtive gestures or sudden movements towards a pocket or other
place where a weapon might be concealed; 2) no threats made and no attempt made
to resist detention; 3) appellant is not shown to be committing or about to commit
any criminal offense, and; 4) appellant does not seem to be under the influence of
alcoholic beverages or drugs.


Worthey, 805 S.W.2d at 438-39 (citing Lippert v. State, 664 S.W.2d 712, 721 (Tex. Crim. App.
1984)).